# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re: | (Chapter 11) |
| Tessemae's LLC,[1] | Case No. 23-10675 (NVA) |
| Debtor. | |
| TESSEMAE'S LLC, DEBTOR AND DEBTOR IN POSSESSION, | |
| Plaintiff, | |
| v. | Adversary No. _____ |
| DEMOCRACY CAPITAL CORPORATION, | |
| Defendant. | |

**COMPLAINT (1) TO DETERMINE VALIDITY, PRIORITY, OR EXTENT OF LIEN PURSUANT TO 11 U.S.C. § 506(d); (2) OBJECTION TO ALLOWANCE OF CLAIM PURSUANT TO BANKRUPTCY RULE 3007; (3) FOR AVOIDANCE OF INCURRENCE OF DEBT AS FRAUDULENT PURSUANT TO 11 U.S.C. §§ 544 AND 550; (4) FOR EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. § 510(c), (5) FOR MONETARY DAMAGES FOR BREACH OF CONTRACT, AND (6) INTENTIONAL <u>INTERFERENCE WITH BUSINESS RELATIONS</u>**

Plaintiff, Tessemae's LLC as Debtor and Debtor in Possession (the "**<u>Debtor</u>**" or

"**<u>Tessemae's</u>**"), by its undersigned counsel, for its complaint against Democracy Capital

Corporation ("**<u>DCC</u>**"), alleges as follows:

### <u>Nature of this Action</u>

1.      The resolution of DCC's claims against the Debtor, and the Debtor's claims

against DCC, will largely determine the outcome of this case for creditors and equity holders.

---

[1]  The Debtor in this Chapter 11 case and the last four digits of its federal tax identification are Tessemae's LLC (2871).  The Debtor's principal address is 714 South Wolfe Street, P.O. Box No. 38438, Baltimore, Maryland 21231.

No action will be more central to the Debtor's efforts to successfully reorganize and to realize the full benefit of its value for the benefit of all stakeholders.

2.      The Debtor brings this action, on behalf of itself and its bankruptcy estate (the "**Estate**"), to have this Court (1) determine pursuant to Bankruptcy Rules 7001(2) and 3007(b) that the claims asserted (and any to be asserted) against the Debtor and the Estate should be determined to be invalid and that DCC's alleged lien against property of the Estate is invalid and extinguished, (ii) in the alternative, that pursuant to 11 U.S.C.§§ 544(b)(1) and 550(a), any and all obligations to DCC incurred by the Debtor prior to bankruptcy are avoidable as fraudulently incurred obligations under applicable law, (iii) that any claim of DCC otherwise allowable in the Debtor's bankruptcy case be equitably subordinated under 11 U.S.C.§ 510(c) due to DCC's inequitable and malicious conduct relating to its claims against the Debtor, (iv) enter monetary judgment against DCC for breach of contract relating to breach of the loan agreement between the Debtor and DCC and intentional interference with business relationships and the damages caused thereby, and (v) such other relief as the nature of this cause may require.

3.      The Debtor's claims against DCC arise from the following: (i) In the spring of 2020, the Debtor paid DCC in full, and fulfilled its obligation to issue the DCC Warrant, to fulfill all obligations due to DCC under the parties' loan agreements which concerned a loan in the principal amount of $3,000,000.00; and (ii) DCC fraudulently attempted to create events of default as a means to assert claims for more than the amounts required to fulfill the Debtor's obligations under the loan agreements, including commencement of litigation and assertion of claims and allegations against third parties which prevented the Debtor from raising the capital needed to continue to meet its obligations to other creditors and to grow its highly valuable business for the benefit of all stakeholders.

65577/0002-44615183v5

**The Parties**

4.      The Debtor is a limited liability company formed and existing under the laws of the State of Maryland.  The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 1, 2023 (the "**Petition Date**"), and is continuing to operate its business as the debtor and debtor in possession.

5.      DCC is a corporation formed and existing under the laws of the State of Delaware, with a principal office located at 4800 Montgomery Lane, 10th Floor, Bethesda, Maryland 20814.

**Jurisdiction and Venue**

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), in that this action arises under or in title 11 of the United States Code (the "**Bankruptcy Code**") and also relates to the Debtor's Estate, as the outcome of this action will have a significant impact on the Estate and the recovery of creditors and equity holders in the Debtor's Chapter 11 case.

7.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(B), (C), (H), (K), and (O).

8.      Pursuant to Bankruptcy Rule 7008, the Debtor consents to entry of final orders and final judgments by this Court in and in connection with this adversary proceeding.

9.      This Court has personal jurisdiction over DCC pursuant to Bankruptcy Rule 7004.

10.      Venue is proper in this Court under 28 U.S.C. § 1409(a), as this is a proceeding under the Bankruptcy Code and it arises in and relates to the Debtor's Chapter 11 case in this Court.

3

## <u>FACTS COMMON TO ALL COUNTS</u>

### *The Founding and Growth of Tessemae's*

11.     The Debtor was founded in 2009 by Gregory Vetter ("**<u>Mr. Vetter</u>**") and his family based on the love of the family and their friends for Mr. Vetter's mother's recipe for healthy and delicious salad dressing that the family believed would fill a void in the products then being offered for healthy dressings.  Tessemae's quickly became one of the nation's premier organic salad dressing companies, manufacturing and wholesaling all-natural, organic salad dressings throughout the United States.

12.     The Tessemae's story began when Mr. Vetter and his family started out by mixing batches of salad dressings themselves and handing out samples to customers in the Whole Foods grocery store in Annapolis, Maryland.  The customer response to those initial samples was so enthusiastic that Tessemae's set a national record for Whole Foods by selling 650 bottles of its first product in just 5 days.  Within 3 years Tessemae's was the top selling salad dressing in the MidAtlantic region of Whole Foods and began expanding into other regions and retailers.  Its gluten free, sugar free, and vegan friendly products quickly became the #1 refrigerated salad drssing at Whole Foods and Safeway.  By 2021, Tessemae's at its peak was producing 36 bottles of dressing per minute which were sold at retail in 12,500 locations nationwide.

13.     Throughout this growth period, the company always maintained its family values.  It formed the Tessemae's Foundation to improve access to healthy foods and life-practices in our country's Healthy Food Priority Areas and chose to use bottles that are BPA-free, recyclable plastic made from polyethylene terephthalate.  Tessemae's was named Sam's Club Fresh Food Supplier of the Year for 2021 and received the Nielsen Design Impact Award in 2018.

14.     The company's initial success did not come without challenges.  Like may start-up companies, the Debtor was not initially profitable and required investments and loans to

4

provide the funding necessary for product development and operations. By early 2018, the Debtor faced serious liquidity challenges and was late in paying vendors, suppliers and other creditors. More recently, the impact of the COVID-19 pandemic exacerbated the Debtor's financial challenges, due to inflated prices for raw materials and labor shortages which reduced manufacturing output and required the company to undergo a reduction in force and shift from self-manufacturing to co-packing. In addition and as discussed more fully below, a lawsuit filed by DCC made it extremely difficult for the Debtor to obtain additional capital required to meet its obligations with respect to maturing unsecured loans and burdened the company with significant litigation expenses at a time when its liquidity was already under stress.

15.    Despite these challenges, Tessemae's customer base and sales remain strong, and today Tessemae's sells 19 distinct products wholesale to 15 regional and national grocery chains including Krogers, Whole Foods, Safeway, Costco, Sam's Club, and others, generating revenues in excess of $15,000,000.00, with orders in excess of $25,000,000.00 on an annual basis.

### The DCC Loan

16.    The Debtor's initial bank lender was Howard Bank, which provided a term loan in the principal amount of $600,000.00 and a revolving line of credit in the maximum amount of $1,000,000.00. This bank financing was insufficient to meet the growing needs of the Debtor and by early 2018, the Debtor was facing severe liquidity issues and was not able to pay many of its vendors, suppliers and other creditors when payments were due.

17.    In these circumstances, the Debtor was able to obtain a loan from DCC, which held itself out as a "boutique" and "bridge" lender who specialized in creating "unique lending solutions" for its clients. To document their agreement, the parties entered into a Second Amended and Restated Loan and Security Agreement dated as of April 10, 2018, a copy of

5

which is attached as **Exhibit 1** (the "**DCC Loan Agreement**") and a Consolidated, Amended and Restated Promissory Note in the amount of $3,000,000.00 (the "**DCC Note**", and together with the DCC Loan Agreement, the "**DCC Loan**"). A copy of the DCC Note is attached as **Exhibit 2**. The DCC Loan amended and restated the Debtor's loan agreements with Howard Bank and increased the maximum principal amount of the debt to $3,000,000.00. The terms of the DCC Loan included a maturity date of 24 months from the execution of the loan documents and the obligation to pay interest at the rate of 15% per annum with 5% of such interest accruing as "paid-in-kind" ("**PIK**") which compounded and accrued to the outstanding principal amount of the loan monthly. The DCC Loan also provided for DCC to receive certain warrants.

18.     The DCC Note further provided that upon payoff of the loan, the Debtor would pay DCC an "Exit Fee" of either $7,500,000 or, in lieu of such payment, issuance of a warrant to purchase certain equity interests in the Debtor on the terms set forth in Paragraph 1.5 of the DCC Note, which would entitle DCC to a minimum of $7,500,000 in the event of a sale or other capital event (the "**DCC Warrant**").

19.     The DCC Loan was secured by a first priority senior lien on the Debtor's assets. In addition, Mr. Vetter and his wife agreed to personally guarantee payment of the loan.

20.     At the time of the DCC Loan and as fully disclosed to DCC, the Debtor's accounts payable totaled $4,130,886, with $2,993,306.22 more than 90 days past due. In DCC's own words, the Debtor was in "poor financial health".[2] As of December 31, 2017, the Debtor's internal balance sheet reflected total liabilities exceeded the book value of the Debtor's assets by more than $17,000,000.00.

---

[2] *See* DCC's Second Amended Complaint, ¶19, *infra* at 10.

21.     To ensure timely payments to DCC in accordance with the loan terms, the Debtor agreed and arranged for DCC to be able to withdraw monthly interest payments directly from the Debtor's bank account, and DCC did so each month from May 2018 through February 2020 without any issue.  *See* DCC Note, ¶ 1.2.[3]

22.     The DCC Loan specified in Section 7.1 the Events of Default.  Most notably, Section 7.1(c) provided that there could be no Event of Default for breach of any of the affirmative covenants in the agreement unless any such breach was not cured within 30 days following notice from DCC, subject to certain exceptions not relevant to this proceeding.  During the term of the loan, DCC withdrew the monthly payments from the Debtor's bank account and never asserted that the Debtor failed to abide by any of the loan covenants, until after DCC was notified that the Debtor intended to pay off the loan in full.

### The Debtor's Payoff of the DCC Loan and DCC's Bad Faith Efforts to Fabricate a Default

23.     In the spring and summer of 2019, the Debtor engaged in serious discussions with two potential funding sources for payoff of the DCC Loan, Morgan Stanley and Jupiter Fund LLC.  During this period, Mr. Vetter was in frequent contact with Jim Plack of DCC concerning the progress made in these negotiations.  DCC was supportive of all of these efforts to raise the funds required to pay off DCC and to provide additional working capital for the Debtor's business.

24.     Beginning as early as December 19, 2020, the Debtor informed DCC that it intended to pay off the DCC Loan before the maturity date, and that it would elect to issue the DCC Warrant rather than pay the Exit Fee in cash, as was its right under the DCC Loan terms.

---

[3] Paragraph 1.2 provides in part: "At Lender's request, all payments due under this Note shall be made by direct debit from one or more accounts maintained by Borrower with Lender."

Communications between Mr. Vetter and Jim Plack of DCC in December 2020 included Mr. Plack's asking about the status of the Debtor's progress in raising the funds required to make the payoff, as well as the possibility of keeping a small balance of the DCC Loan unpaid by mutual agreement. At a breakfast meeting held on January 8, 2020 between Mr. Vetter and Jim Plack of DCC, when Mr. Vetter confirmed the Debtor's plan to pay off the DCC Loan and issue the DCC Warrant, Mr. Plack asked Mr. Vetter to pay DCC a substantially reduced Exit Fee in cash rather than in the form of the DCC Warrant. Mr. Vetter advised Mr. Plack that he would need to discuss that alternative internally.

25.     On January 22, 2020, Mr. Plack texted Mr. Vetter and asked:  Were you able to complete your $12m raise?"  This inquiry concerned a $12 million loan which the Jupiter Fund had committed to provide at the time.  Mr. Vetter responded "Yes".

26.     During the same time period, the Debtor's counsel made multiple attempts to communicate with DCC's counsel about the mechanics of the loan payoff and the form of the DCC Warrant to be issued as part of the payoff of the DCC Loan. DCC's counsel was unresponsive.  DCC's unwillingness to communicate with the Debtor concerning the DCC Warrant was not only a violation of the covenant of good faith and fair dealing in all contracts, it also violated DCC's express obligation under Paragraph 1.5 of the DCC Note to act in good faith with respect to working with the Debtor to ensure that the form of the Warrant was mutually acceptable.

27.     On February 17, 2020, Mr. Vetter sent Mr. Plack an email advising DCC of the Debtor's intention to issue the DCC Warrant in lieu of paying the Exit Fee in cash, and summarizing the proposed terms for the DCC Warrant, asking Mr. Plack for DCC's comments.

28.    On February 21, 2020, instead of responding to Mr. Vetter's email to work out the details of the payoff and the DCC Warrant, and just weeks before the Debtor was to pay off the outstanding loan balance, DCC's counsel sent the Debtor and Mr. Vetter a notice of default, alleging for the first time that the Debtor was in default (the "**Notice of Default**").  Based on the allegations in the Notice of Default, DCC claimed that the maturity date of the loan was accelerated and that the Debtor no longer had the option of issuing the DCC Warrant in payment of the Exit Fee.  The allegations in the Notice of Default were false and were intended by DCC to create a fraudulent basis to require the Debtor to pay DCC $7,500,00.00 in cash instead of issuing the DCC Warrant, along with a number of other alleged charges for which there was no legitimate basis.

29.    Through a series of detailed letters, the first of which was sent on March 2, 2020 and continuing through April 7, 2020, the Debtor's counsel refuted each of the alleged defaults and requested that DCC explain the basis for the alleged defaults.  In a letter sent on March 10, 2020, DCC's counsel declined to "get[] into too much detail" regarding the default allegations.

30.    DCC's actions in March continued to pursue a course of action designed by DCC to sabotage the Debtor's efforts to pay off the DCC Loan without any prior Event of Default. These actions included the following: (i) In early March, for the first time ever, DCC failed to withdraw the prescheduled monthly interest payment from the Debtor's bank account, contrary to the parties' agreement for DCC to do so; (ii) After the Debtor learned of DCC's failure to withdraw the expected payment, the Debtor reached out to DCC and tried to make the payment by wire transfer, but to the Debtor's surprise, the wire failed because DCC changed its bank account without informing the Debtor; (iii) After DCC refused to respond to efforts by the Debtor to find out how the Debtor could wire the payment to DCC, the Debtor sent a check to

9

DCC's counsel for the March monthly interest payment, which DCC accepted and deposited; and (iv) DCC refused to provide wire transfer instructions to the Debtor to enable the Debtor to send DCC full payoff of the loan, which resulted in the Debtor sending a $3,400,000.00 check to DCC's counsel on April 3, 2020, which paid off the unpaid balance due for the loan before the maturity date and which DCC accepted and deposited.

31.    Accordingly, prior to the maturity date of the loan, the Debtor paid DCC on account of its $3,000,000.00 loan more than $4,000,000.00, including a prepayment fee (which DCC accepted) and more than $1,000,000.00 in interest for the less than two-year period of the DCC Loan.  In addition, on March 2, 2020, the Debtor issued the DCC Warrant to DCC consistent with the terms of the DCC Loan.  The DCC Warrant included all of the required elements of the warrant as set forth in Paragraph 1.5 of the DCC Note.  Although DCC later asserted that the form of the DCC Warrant was not acceptable, it did so in bad faith since DCC refused to communicate with the Debtor to discuss the form of the DCC Warrant in violation of DCC's obligation to confer with the Debtor in good faith with respect to the warrant.

32.    On or about August 1, 2022, DCC sent dozens of letters to junior creditors of the Debtor and guarantors, falsely asserting that the Debtor had defaulted on its loan obligations to DCC because it "fail[ed] to satisfy the Debt by the maturity date under the Loan Documents." Relying on its false claims of default, DCC demanded that the recipients of the letters immediately pay DCC millions of dollars or hold any funds that they have received from the Debtor in trust for DCC's benefit, failing which DCC threatened to take legal action against the recipients.

33.    This was not enough for DCC.  On November 12, 2020, DCC filed a confession of judgment against the Debtor and Mr. and Mrs. Vetter in the Circuit Court for Baltimore

County, claiming that the Debtor owed DCC an additional $9,638,540.57 plus legal fees and interest.

34.     On May 10, 2022, the Circuit Court for Baltimore County conducted a hearing before the Honorable Judith C. Ensor on the Debtor's motion to vacate the confessed judgment, and the Circuit Court granted the motion to vacate and entered an order vacating the judgment on the same day, based on the Court's finding an actual controversy as to the merits of the action that required litigation pursuant to Maryland Rule 2-611(e).

35.     DCC, in its quest to extract even more extreme penalties from the Debtor, filed an Amended Complaint on July 8, 2022, increasing the amount of its claims to $11,500,000.00 plus attorneys' fees and interest.  On December 23, 2022, DCC filed a Second Amended Complaint in the Circuit Court, increasing the amount of its claims to the amount of $13,852,897.14 plus attorneys' fees and other charges.

## COUNT I
### Determination of the Validity, Priority, or Extent of DCC's Lien
### pursuant to 11 U.S.C. § 506(d)

36.     The Debtor incorporates by reference the allegations set forth in Paragraphs 1 through 35 above as if fully set forth herein.

37.     Under the DCC Loan documents, DCC holds a security interest in the Debtor's assets which, by virtue of the timing of its filing, would have a first-priority senior lien position over other secured claims against the Debtor—if DCC had a valid claim.

38.     In April 2020, the Debtor paid DCC in full for all amounts due under the DCC Loan and issued the DCC Warrant.  To the extent that DCC claimed and continues to claim that it is owed other amounts under the DCC, those claims are invalid and false.

39.     Because the Debtor owes nothing to DCC for the DCC Loan, DCC has no valid secured claim against the Debtor or any of the assets of the Estate, and any lien held by DCC is void and should be determined to be void.

**COUNT II**
**Objection to Allowance of DCC's Claim under 11 U.S.C. § 502(b)**
**pursuant to Bankruptcy Rule 3007**

40.     The Debtor incorporates by reference the allegations set forth in Paragraphs 1 through 39 above as if fully set forth herein.

41.     Prior to the Petition Date, the Debtor fully paid all valid amounts due to DCC under the DCC Loan.  To the extent DCC asserted claims for any additional amounts allegedly due to DCC, those claims were false, invalid, and fraudulent, and inconsistent with the terms of the parties' loan agreements.

42.     In addition, for the reasons stated below in Count III, Count V, and Count VI below, the Debtor has claims against DCC for its wrongful conduct and the damages caused by DCC's wrongful conduct to the detriment of the Debtor and creditors of the Estate.  As a result of these claims, the Debtor has substantial rights of setoff against any conceivable claims DCC may assert in this bankruptcy case, which substantially exceed any valid claim DCC might have.

43.     Pursuant to Bankruptcy Rule 3007(b), the Debtor objects to DCC's claims and requests that all such claims be disallowed pursuant to Section 502(b) of the Bankruptcy Code.

**COUNT III**
**Avoidance of Incurrence of Debt as Fraudulent pursuant to 11 U.S.C. §§ 544 and 550**

44.     The Debtor incorporates by reference the allegations set forth in Paragraphs 1 through 43 above as if fully set forth herein.

45.     At the time the Debtor entered into the loan agreements with DCC in April 2018, the Debtor was struggling financially, with liabilities substantially exceeding the then fair market value of its assets.

46.     Under the DCC loan agreements, including the DCC Loan Agreement and DCC Note, the Debtor incurred obligations at a time when the Debtor was insolvent or was rendered insolvent by such obligations, for which the Debtor did not receive fair consideration.

47.     As of April 2018, when the Debtor incurred the obligations to DCC under the DCC Loan Agreement and DCC Note, the Debtor had unreasonably small capital for the conduct of its subsequent business.

48.     Upon information and belief, at the time DCC induced the Debtor to obtain the loan from DCC, DCC intended to find a way to impose on the Debtor not only the fees, interest, and other charges properly due under the DCC Loan but also to subject the Debtor with an Exit Fee in the form of a $7,500,000 payment rather than issuance of the DCC Warrant which was the Debtor's right to do under the loan documents.

49.     The Debtor had no reason to suspect DCC of such nefarious intent until after February 20, 2020, when DCC issued the Notice of Default without any basis for doing so.

50.     The Debtor has multiple unsecured creditors as of the Petition Date with allowable claims under Section 502 of the Bankruptcy Code and with respect to which the Debtor's incurrence of debt to DCC under the DCC loan agreements is voidable under applicable law within the meaning of Section 544(b)(1) of the Bankruptcy Code.

51.     Under 11 U.S.C. §§ 544(b)(1) and 550(a) and Title 15 of the Commercial Law Article of the Annotated Code of Maryland, Sections 15-201 *et seq.,* the Debtor is entitled to

avoid the incurrence of debt to DCC and to void any remaining claim DCC may assert against the Debtor.

## COUNT IV
## Equitable Subordination of DCC's Claims pursuant to 11 U.S.C. § 510(c)

52.     The Debtor incorporates by reference the allegations set forth in Paragraphs 1 through 47 above as if fully set forth herein.

53.     The DCC, through a series of fraudulent and dishonest actions designed to impose on the Debtor excessive fees and charges beyond those for which the Debtor was obligated under the DCC Loan, is guilty of highly inequitable conduct, resulting in injury to the Debtor and its creditors and equity holders and which conferred upon DCC an unfair advantage.

54.     Based on DCC's inequitable conduct, equitable subordination of DCC's claims to the claims of all other creditors is not inconsistent with the provisions of the Bankruptcy Code, and is appropriate relief under Section 510(c) of the Bankruptcy Code.

## COUNT V
## Breach of Contract and the Covenant of Good Faith and Fair Dealing

55.     The Debtor incorporates by reference the allegations set forth in Paragraphs 1 through 54 above as if fully set forth herein.

56.     Under the DCC Loan, the Debtor had a contractual right, upon payment in full of all principal and interest due thereunder, to fulfill its contractual obligation to provide an Exit Fee in the form of the DCC Warrant.

57.     By a series of fraudulent acts, including issuance of the Notice of Default, DCC intentionally did all it could to attempt to prevent the Debtor from making full payment of the DCC Loan prior to the maturity date.  Among other wrongful acts, DCC willfully failed to withdraw from the Debtor bank account the monthly interest payment due for March 2020 and

14

pursued evasive tactics to prevent or delay the Debtor from making payments to DCC, including the final payoff of the DCC Loan.  In addition, DCC failed to provide the Debtor with an opportunity to cure any alleged default in accordance with the terms of the DCC Loan.

58.     Because there was not valid Event of Default, DCC's declaration of a default was a violation of the terms of the DCC Loan and a transparent and wrongful attempt to prevent the Debtor from issuing the DCC Warrant instead of being subjected to a $7,500,000.00 Exit Fee in the form of a cash payment.  In addition, DCC violated its contractual obligations under the DCC Note by refusing to communicate with the Debtor to confirm the form of the DCC Warrant to be issued, in a further attempt to prevent the Debtor from performing its obligation to issue the DCC Warrant.

59.     By its actions, DCC breached its obligations under the DCC Loan and failed to exercise good faith in performing its contractual obligations to the Debtor under the DCC Loan. In particular, DCC violated its covenant of good faith and fair dealing by prohibiting or attempting to prohibit the Debtor from timely performing its obligations to make payments, to issue the DCC Warrant on terms mutually acceptable to the parties, and otherwise to fulfill the Debtor's contractual obligations under the DCC Loan.

60.     As a result of DCC's wrongful actions, including commencement of litigation in the Circuit Court for Baltimore County, the Debtor incurred substantial damages, which include incurrence of substantial legal fees and expenses.  In addition, DCC's litigation and pursuit of amounts not legitimately owed under the DCC Loan prevented the Debtor from raising the capital it needed to meet its obligations to creditors and to grow its business to meet the demands of its customers.

65577/0002-44615183v5

## COUNT VI
## <u>Intentional Interference with Business Relations</u>

61.     The Debtor incorporates by reference the allegations set forth in Paragraphs 1

through 60 above as if fully set forth herein.

62.     DCC, by its actions in sending letters to dozens of the Debtor's other creditors

who had invested in or made junior loans to the Debtor, intentionally interfered with the Debtor's

relations with these investors and junior creditors.  DCC, through its false representations that the

Debtor had failed to pay off the DCC loan prior to the maturity date, sent these letters to cause

the Debtor actual harm and loss by cutting off and destroying potential sources of additional

capital and damaging the Debtor's relations with these creditors, with the intention of pressuring

the Debtor to surrender to DCC's false claims.

63.     DCC's wrongful conduct, including its filing of the confessed judgment in the

Baltimore County Circuit Court, prevented the Debtor from raising capital from third parties that

would have enabled the Debtor to fund its business operations and meet its obligations to other

creditors.  These actions by DCC constitute intentional tortious interference with the Debtor's

business relations for which DCC is liable under Maryland law.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Debtor prays for the entry of Orders granting the following relief and

judgment against DCC:

(1)     an Order under Section 506(d) of the Bankruptcy Code determining that DCC's

lien against the assets of the Estate is void and of no force and effect;

(2)     an Order disallowing all claims held or asserted by DCC against the Debtor and

the Estate pursuant to Section 502(b) of the Bankruptcy Code;

(3)      an Order avoiding as fraudulent any claims of DCC pursuant to 11 U.S.C. §§ 544(b)(1) and 550(a) and Title 15 of the Commercial Law Article of the Annotated Code of Maryland, Sections 15-201 *et seq.*, and disallowance of any claims of DCC under 11 U.S.C. § 502(d);

(4)      an Order equitably subordinating DCC's claims pursuant to Section 510(c) of the Bankruptcy Code to the claims of all other general unsecured creditors of the Debtor, based on DCC's egregious and inequitable conduct relating to the DCC Loan;

(5)      a monetary judgment against DCC in an amount to be determined by the Court to compensate the Debtor for damages incurred as a result of DCC's breach of the DCC Loan, including breach of the covenant of good faith and fair dealing;

(6)      a monetary judgment against DCC in an amount to be determined by the Court for damages caused by DCC's intentional interference with the Debtor's business relations with its investors and junior creditors; and

(7)      such other and further relief as the nature of this cause may require.

Dated:  February 9, 2023                          **COLE SCHOTZ P.C.**

                                By:  */s/ Gary H. Leibowitz*
                                        Gary H. Leibowitz (Bar No. 24717)
                                        Irving E. Walker (Bar No. 00179)
                                        H.C. Jones III (Bar No. 20064)
                                        300 East Lombard Street, Suite 1111
                                        Baltimore, MD  21202
                                        (410) 230-0660
                                        (410) 230-0667 (fax)
                                        gleibowitz@coleschotz.com
                                        iwalker@coleschotz.com
                                        hjones@coleschotz.com

                                        *Proposed Counsel for Debtor and Debtor-In-Possession, Plaintiff*

17